J-A12008-26

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: C.C., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: J.G., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 2687 EDA 2025 |

Appeal from the Order Entered September 22, 2025
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-DP-0000253-2022

| | | |
|---|---|---|
| IN THE INTEREST OF: C.J.C., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: J.G., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 2688 EDA 2025 |

Appeal from the Decree Entered September 23, 2025
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-AP-0000177-2024

BEFORE:   LAZARUS, P.J., SULLIVAN, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY SULLIVAN, J.:                    **FILED JULY 22, 2026**

J.G. ("Mother") appeals from the order changing the goal of C.C.

("Child"), born in February 2022, from reunification to adoption and the decree

_____

[*] Former Justice specially assigned to the Superior Court.

terminating Mother's parental rights.[1]  On appeal, Mother challenges the admissibility of evidence, the sufficiency of the evidence, and the constitutionality of the proceedings.  As Mother's challenges do not merit relief, we affirm the involuntary termination decree and dismiss the appeal from the goal change order as moot.[2]

We take the underlying facts and procedural history in this matter from the trial court's opinion and our independent review of the certified record.

Child was born in February 2022, and, at birth, tested positive for both cocaine and fentanyl and was experiencing withdrawal symptoms.  *See* Trial Court Opinion, 11/18/25, at 2.  Child remained in the hospital for approximately six weeks.  At the time of discharge, the Department of Human Services ("DHS") obtained an order of protective custody and placed Child in the home of her maternal uncle, where she remains.  *See id*.  The trial court adjudicated Child dependent on July 12, 2022.  Between July 2022 and April 2024, the trial court held several review hearings.  Early on, Mother was somewhat compliant with certain portions of her service plan objectives.  Those objectives were remaining drug-free, finding appropriate housing,

---

[1] By separate decree, the trial court involuntarily terminated the parental rights of Child's father, D.C. ("Father").  Father did not appeal.

[2] Given our disposition concerning termination, Mother's challenges to the goal change order are moot.  *See Interest of A.M.*, 256 A.3d 1263, 1272-73 (Pa. Super. 2021) (declaring goal change issues moot once parental rights are terminated).  We therefore will not address the issues numbered eight, nine, and eleven in Mother's brief.

employment, and attending parenting classes; however, Mother never progressed beyond supervised visitation and continued to mostly test positive for use of cocaine and fentanyl.  *See id*. at 2-4.  On April 30, 2024, DHS petitioned to change Child's goal from reunification to adoption and, thereafter, petitioned to terminate Mother's parental rights.  *See id*. at 3.  The trial court conducted goal change/termination hearings in July and September 2025.  *See id*.

At the termination hearing Community Umbrella Agency  ("CUA") case manager Monira Cole ("Ms. Cole") testified she was assigned to the case in October 2024 but had the opportunity to review the entire file.  *See id*. at 3. Ms. Cole explained Mother was minimally compliant with her plan objectives between 2022 and late 2023, testing positive for cocaine, fentanyl, methadone, and marijuana on several occasions.  *See id*. at 4.  Mother enrolled in a drug treatment program at Jefferson University Hospital but did not successfully complete the program.  *See id*.  Mother claimed she enrolled in a different treatment program but never provided Ms. Cole with paperwork to corroborate her participation in treatment.  *See id*.  In late 2023 and early 2024, Mother had several negative random drugs screens; however, Mother stopped attending regular random drug tests after June 2024.  *See id*. at 4-5.  Ms. Cole also explained Mother failed to attend parenting and housing classes as required by her service plan, and while her housing appeared suitable, Mother never provided CUA with a copy of her lease.  *See id*. at 6.

Varsha Antony ("Ms. Antony") an outcome specialist at CUA was also assigned to the case in October 2024. *See id*. at 5. She reached out to Mother who was uncooperative and unresponsive to outreach efforts. *See id*.; *see* N.T., 7/17/25, at 129-30. Prior to the July 2025 hearing, Mother did sign releases to allow CUA to obtain access to her drug treatment records. *See* Trial Court Opinion, 11/18/25, at 5; *see also* N.T., 7/17/25, at 130. However, Mother did not attend any of the random drug screens scheduled by Ms. Antony. *See* Trial Court Opinion, 11/18/25, at 5; *see* N.T., 7/17/25, at 132-33. Ms. Antony believed Mother had relapsed; explaining that, during a home visit, Mother seemed incoherent, swaying as she spoke and there was a strange odor in the home. *See* N.T., 7/17/25, at 133. Ms. Antony noted she personally notified Mother on three occasions about the termination hearing, but Mother did not appear at the hearing. *See id*. at 158.

As noted above, Mother never progressed beyond supervised visits. *See* Trial Court Opinion, 11/18/25, at 6. While Mother was initially compliant with her visitation schedule, her attendance at visits became erratic in October 2024 and she had not seen Child since March 2025. *See id*. at 6-7. Ms. Cole testified Mother did well during the visits but because of her refusal to cooperate with random drug screening, her visits could not progress to unsupervised visitation. *See id*. at 7. Ms. Cole acknowledged a bond between Mother and Child but noted Child never asked about Mother nor expressed a desire to see her. *See id*. at 8. Ms. Cole explained there had been no changes

in Child's behavior since Mother stopped visiting. ***See id***. Ms. Cole averred while Mother would occasionally text maternal uncle, she never asked about Child, had not called Child since early 2025, and had never attended any of Child's medical appointments. ***See id***. at 8-9.

Ms. Cole did not believe breaking the bond with Mother would cause irreparable harm. ***See id***. Ms. Cole testified Child had been in her current placement with maternal uncle since she was approximately one month old. ***See id***. at 9. She is bonded with her uncle and aunt and looks to them to meet all her needs, and removal from their care would be detrimental to Child. ***See id***. Ms. Cole opined Child needed the stability of adoption and permanent legal custody ("PLC") would not be an appropriate goal because of Mother's continued drug use. ***See id***.

Ms. Cole's testimony was supported by the testimony of family support worker Winifred Howard ("Ms. Howard"). ***See*** Trial Court Opinion, 11/18/25, at 7. She stated that while Mother visited regularly prior to September 2024, her visits in October and November 2024 were inconsistent, and Mother failed to appear for any visits between November 2024 and late February 2025. ***See id***.; N.T., 7/17/25, at 99-100. Mother had a visit in February 2025 but then stopped visiting altogether and had no visits between March 2025 and the termination hearing in July 2025. ***See*** Trial Court Opinion 11/18/25, at 7; ***see also*** N.T., 7/17/25, at 100. Ms. Howard pointed out Mother sometimes ended visits early and sometimes confirmed visits then canceled them when

Child was already at the agency. *See* Trial Court Opinion, 11/18/25, at 7; *see also* N.T., 7/17/25, at 104-06. Ms. Howard agreed Child enjoyed visiting Mother but was always happy to return to her kinship parents at the end of visits. *See id*.; *see also* N.T., 7/17/25, at 102-03, 114-16. Ms. Howard also noted while the visits went well, they took place in a very controlled environment with a supervisor available to intervene if there was a problem. *See* N.T., 7/17/25, at 126.

Theodora Gladden ("Ms. Gladden") the prior CUA visitation coach, who supervised visits during the period when Mother was mostly attending visits, agreed Mother did well with the visits, interacting appropriately with Child and meeting her physical and emotional needs. *See* Trial Court Opinion, 11/18/25, at 7; *see also* N.T., 7/17/25, at 166-68, 170-72. Ms. Gladden noted Mother missed several visits during the period she supervised them, which was the middle period of the case. *See* N.T., 7/17/25, at 174-75. Ms. Gladden testified that Mother only saw Child when she was healthy and never cared for her when Child was not feeling well. *See id*. at 176. Ms. Gladden acknowledged the visits were more like play dates and that Child would come up to her and try to encourage her to join in the play. *See id*. at 177. Ms. Gladden also confirmed when visiting time was over, Child easily transitioned back to her kinship family. *See id*.

Deyvonnia Williams ("Ms. Williams") supervised certain visits between Mother and Child soon after Child entered care between late 2022 and October

2023. *See* Trial Court Opinion, 11/18/25, at 8. Ms. Williams also stated Mother did well with visits and she observed a bond between Mother and Child. *See id*. However, Ms. Williams was unaware of any recent interactions between the two. *See id*.

Mother presented the expert testimony of Dr. Mishka Terplan ("Dr. Terplan"). *See id*. Dr. Terplan is an OB/GYN with expertise in addiction medicine. *See id*. Dr. Terplan reviewed the documentation in the case and conducted a 45-minute telephone interview with Mother. *See id*. at 10. However, Dr. Terplan did not review any case material after June 2024. *See id*. Dr. Terplan opined Mother was in recovery at the time he interviewed her and people in recovery often "return to use." *Id*. He stated this did not impact people's long-term prognosis and merely testing positive for drug use did not necessarily impact their behavior, and he opined Mother's substance abuse disorder did not indicate she was unable to care for her child. *See id*. Dr. Terplan did not believe a person needed to abstain from drug use to have safe contact with a child and drug use was not incompatible with safe parenting. *See id*. at 11. Dr. Terplan further explained positive drug screens were not a red flag, continued drug use was not "categorically harmful" to the parent-child relationship, and stopping drug treatment did not mean parental rights should be terminated. *Id*. at 11.

On cross-examination, Dr. Terplan admitted he was unaware that Mother testified positive for multiple substances and the large number of

positive tests, and that this was "concerning;" he also admitted he did not know that Mother left drug treatment, had stopped showing up for random drug screens, and had stopped visiting Child. *Id*. Dr. Terplan had never met Child, observed any visitation between Mother and Child, or observed Child with her kinship parents. *See id*. at 12. Despite this, Dr. Terplan maintained that someone in recovery could use cocaine and fentanyl responsibly. *Id*.

As noted, Mother did not appear and therefore did not testify at the hearings. The trial court changed the goal to adoption and terminated Mother's parental rights. Mother filed the instant, timely appeal.[3]

On appeal, the following issues remain for our review:

1. Did the trial court commit an error of law and abuse of discretion by involuntarily terminating [Mother's] parental rights under 23 Pa.C.S.A. § 2511(a), where the trial court relied on inadmissible hearsay—in violation of Pa.R.E. 802—to find clear and convincing evidence that [Mother] was unfit or unwilling to parent [Child]?

2. Did the trial court err as a matter of law and abuse its discretion by involuntarily terminating [Mother's] parental rights under 23 Pa.C.S.A. § 2511(a)(1) where DHS failed to prove by clear and convincing evidence that, for a period of at least six months immediately preceding the filing of the petition, [Mother] relinquished her parental claim to [Child] or refused or failed to perform parental duties?

3. Did the trial court err as a matter of law and abuse its discretion by involuntarily terminating [Mother's] parental rights to [Child] under 23 Pa.C.S.A. § 2511(a)(2), where DHS failed to prove by clear and convincing evidence that the repeated and continued incapacity, abuse, neglect or refusal of [Mother] caused [Child] to be without essential parental care, and that [Mother] could not or

_____

[3] Mother and the trial court complied with Pa.R.A.P. 1925.

would not remedy the conditions of incapacity, abuse, neglect, or refusal?

4. Did the trial court err as a matter of law and abuse its discretion by involuntarily terminating [Mother's] parental rights to [Child] under 23 Pa.C.S.A. § 2511(a)(5), where DHS failed to prove by clear and convincing evidence that [Child] was removed from [Mother's] care for at least six months, the conditions which led to placement continued to exist, [Mother] could not or would not remedy those conditions, the services reasonably available to [Mother] were unlikely to remedy those conditions within a reasonable period of time, and termination of parental rights best served the needs and welfare of [Child]?

5. Did the trial court err as a matter of law and abuse its discretion by involuntarily terminating [Mother's] parental rights to [Child] under 23 Pa.C.S.A. § 2511(a)(8), where DHS failed to prove by clear and convincing evidence that 12 or more months elapsed since the date of removal or placement, the conditions which led to removal or placement continued to exist, and termination of [Mother's] parental rights best served the needs and welfare of [Child]?

6. Did the trial court err as a matter of law and abuse its discretion by involuntarily terminating [Mother's] parental rights under 23 Pa.C.S.A. § 2511(b), where DHS failed to prove by clear and convincing evidence that involuntarily terminating [Mother's] parental rights would best serve the needs and welfare of [Child]?

7. Did the trial court commit an error of law and abuse of discretion by involuntarily terminating [Mother's] parental rights under 23 Pa.C.S.A. § 2511(b), where the trial court relied on improper opinion testimony—in violation of Pa.R.E. 701 —to find clear and convincing evidence that termination would be best suited to [C]hild's needs and welfare?

8. Did the trial court commit an error of law and abuse of discretion under the Pennsylvania and U.S. Constitutions by involuntarily terminating [Mother's] parental rights where DHS failed to prove that termination is narrowly tailored to a compelling state interest?

Mother's Brief at 3-4 (citation format regularized, some issues renumbered).

In her first issue, Mother challenges the admission of hearsay testimony. *See* Mother's Brief at 20-30. Specifically, Mother maintains "numerous statements" made by Ms. Cole were hearsay. *See id*. at 21. Mother notes Ms. Cole was not assigned to the case until over two years after it opened but the trial court allowed her to testify as to earlier events based upon her review of the case file. *See id*. Mother argues the records of Mother's drug tests were improperly admitted under the business records exceptions because they were not CUA's records kept by Ms. Cole. *See id*. at 22-24. Mother contends Ms. Cole should not have been permitted to testify as to any events in the file that she lacked personal knowledge of. *See id*. at 24-26. Mother also avers the trial court should not have been allowed to consider the certified record of the dependency case or base its conclusions at a termination proceeding based on its own knowledge of the case from the dependency proceedings. *See id*. at 27-28. Lastly, Mother claims the admission of this evidence was not harmless error. *See* id. at 28-30.

The trial court opined:

[Ms. Cole's] testimony was relevant and admissible. Additionally, in a disposition hearing, all evidence that is helpful in determining the questions presented may be considered by the court to the extent of its probative value. 42 Pa.C.S.A. § 6341(d).

\* \* \* \* \*

Ms. Cole was the CUA Case Manager assigned to this family at the time of the TPR Hearing. Ms. Cole testified that she maintains the CUA file for this case, and that she reviewed the entire case file and its history. Single Case Plan (SCP) objectives were developed for this family for reunification. They are included in the CUA case

file. Information regarding referrals CUA made to assist this family in engaging in reunification services are also included in the CUA case file as are visitation logs and notes. [The trial c]ourt found that Ms. Cole'[s] testimony regarding Mother's SCP was relevant and admissible, and that DHS properly laid the foundation for her testimony[.] . . . Additionally, court orders were issued after every permanency review hearing containing information regarding Mother's SCP objectives, her compliance with those objectives, and her progress toward alleviating the circumstances which brought the Child into care. These orders are a part of the Child's detailed dependency docket, which was entered into evidence at the TPR hearing. Also, the results of Mother's drug screens admitted into evidence as DHS-1 were entered into evidence at prior permanency review hearings and are a part of the certified case record.

In a disposition hearing, all evidence that is helpful in determining the questions presented may be considered by the court to the extent of its probative value. 42 Pa.C.S.A. § 6341(d). For dispositional purposes, [the trial c]ourt allowed CUA Case Manager, Ms. Cole, to testify regarding the services CUA implemented to assist Mother in achieving reunification. Throughout the case, Mother made minimal progress toward alleviating the reasons which necessitated the Child's removal from her care. Ms. Cole had personal knowledge of the family's case. She reviewed and maintained the CUA case file, informed Mother of her SCP objectives, referred her to the CEU and to the ARC, and was actively working to implement services to assist the family in achieving reunification. Thus, [the trial c]ourt properly found that Ms. Cole'[s] testimony was relevant and admissible for dispositional purposes under 42 Pa.C.S.A. § 6341(d).

[The trial c]ourt also presided over this family's case since its inception, has heard testimony regarding Mother's compliance with her SCP objectives and progress toward reunification, and has issued orders to assist the parents in engaging in their SCP objectives. Based on its own observations as well as from the testimony and evidence presented regarding Mother's lack of full compliance and progress with her SCP objectives, [the trial c]ourt determined that it was in the Child's best interest for Mother's parental rights to be terminated and that adoption was the permanency goal best suited to the needs and welfare of the Child.

Trial Court Opinion, 11/18/25, at 26-28 (record citation omitted).

"[T]he decision of whether to admit or exclude evidence is within the sound discretion of the [trial] court." *In re A.J.R.-H.*, 188 A.3d 1157, 1166-67 (Pa. 2018). We will not disturb the trial court's ruling unless it has abused its discretion—*e.g.*, when it has overridden or misapplied the law. *See id*. at 1167. Moreover, in the context of termination proceedings "the standard for finding harmlessness . . . requires us to conclude that the evidentiary error could not have had any impact upon the orphans' court's decision." *Id*. at 1175 (citation omitted).

The Pennsylvania Rules of Evidence ("the Rules") establish that "relevant evidence" is generally admissible, so long as it concerns the underlying controversy and has probative value. *See* Pa.R.E. 401 and 402. The Rules, however, concomitantly prohibit the admission of hearsay, unless the evidence offered is subject to at least one of a limited number of exceptions. *See* Pa.R.E. 802-803; *see also A.J.R.-H.,* 188 A.3d at 1167. "Hearsay" is defined as a statement that "the declarant does not make while testifying at the current trial or hearing[,]" and which "a party offers in evidence to prove the truth of the matter asserted in the statement." Pa.R.E. 801(c)(1)-(2).

Rule 803(6) of the Pennsylvania Rules of Evidence provides that "records of a regularly conducted activity," *i.e.*, "business records," are admissible if they meet the following conditions:

(A) the record was made at or near the time by--or from information transmitted by--someone with knowledge;

(B) the record was kept in the course of a regularly conducted activity of a "business", which term includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit;

(C) making the record was a regular practice of that activity;

(D) all these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification that complies with Rule 902(11) or (12) or with a statute permitting certification; and

(E) the opponent does not show that the source of information or other circumstances indicate a lack of trustworthiness.

Pa.R.E. 803(6); *see also* 42 Pa.C.S.A. § 6108.

In *In re: Adoption of G.W.*, 342 A.3d 68, 95 (Pa. Super. 2025) (*en banc*), this Court expressed its concerns about the introduction at termination hearings of "multiple levels of hearsay." *See G.W.*, 342 A.3d at 94 and n. 21. *See also G.W.*, *supra* at 95-97 (Lazarus, P.J. concurring, joined by a majority of the *en banc* panel) (disapproving of an agency's reliance on a casework supervisor's testimony that another caseworker informed her about a critical fact in the termination proceedings, and pointing out that such reliance "diluted" the agency's burden of proof by relying on hearsay testimony to prove its case); *cf*. *Interest of A.H.*, 279 A.3d 1272 (Pa. Super. 2022) (unpublished memorandum) (concluding trial court erred in admitting testimony of drug screen results conducted by a third party via the testimony

of a CUA case manager but concluding the error was harmless);[4] ***but see***

***Interest of A.D.***, 321 A.3d 922 (Pa. Super. 2024) (unpublished memorandum) (finding Father waived his claim that the trial court improperly admitted hearsay testimony of a new case manager but holding in the alternative that testimony regarding Father's lack of visitation would have been properly admitted under the business records exception to the hearsay rule); ***Interest of C.G.***, 290 A.3d 664 (Pa. Super. 2022) (unpublished memorandum) (finding waiver regarding hearsay objection but also holding trial court properly took judicial notice of the dependency docket and its own prior orders).

In the instant matter, even assuming, *arguendo*, that portions of Ms. Cole's testimony constituted improper hearsay, the record reflects that the admission of such testimony was harmless. ***See A.H.***, ***supra***.  As we discuss, *infra*, the evidence was sufficient to sustain the termination of Mother's parental rights. ***See id***.  Moreover, in its opinion, the trial court makes clear that it did not rely on any hearsay testimony in making its determination but relied on its own knowledge of the dependency record and its past orders. ***See C.G.***, ***supra***.  Thus, Mother's first claim does not merit relief.

_____

[4] ***See*** Pa.R.A.P. 126(b) (unpublished non-precedential memoranda decision of Superior Court filed after May 1, 2019, may be cited for persuasive value).

In her second issue, Mother maintains the evidence was insufficient to sustain the termination of her parental rights pursuant to 23 Pa.C.S.A. § 2511(a).  *See* Mother's Brief at 30-31.

We begin with our well-settled standard of review:

> The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record.  If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion.  A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will.  The trial court's decision, however, should not be reversed merely because the record would support a different result.  We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Our Supreme Court has repeatedly stated that in termination cases, deference to the trial court is particularly crucial.  *See In re Adoption of L.A.K.*, 265 A.3d 580, 597 (Pa. 2021); *see also Interest of S.K.L.R.*, 256 A.3d 1108, 1124 (Pa. 2021) ("When a trial court makes a 'close call' in a fact-intensive case involving . . . the termination of parental rights, the appellate court should review the record for an abuse of discretion and for whether evidence supports that trial court's conclusions; the appellate court should not search the record for contrary conclusions or substitute its judgment for that of the trial court.").  The abuse-of-discretion standard in termination cases "is a highly deferential standard and, to the extent that the record supports the

court's decision, we must affirm even though evidence exists that would also support a contrary determination." ***In re P.Z.***, 113 A.3d 840, 849 (Pa. Super. 2015) (citation omitted); ***see also T.S.M.***, 71 A.3d at 267. Furthermore, the "trial court is free to believe all, part, or none of the evidence presented, and is likewise free to make all credibility determinations and resolve conflicts in the evidence." ***In re M.G.***, 855 A.2d 68, 73-74 (Pa. Super. 2004) (citation omitted).

Clear and convincing evidence is evidence that is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." ***In re C.S.***, 761 A.2d 1197, 1201 (Pa. Super. 2000) (*en banc*) (quoting ***Matter of Adoption of Charles E.D.M., II***, 708 A.2d 88, 91 (Pa. 1998)).

Termination of parental rights is governed by section 2511 of the Adoption Act, which requires a bifurcated analysis.

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child . . . .

***In re C.M.K.***, 203 A.3d 258, 261-62 (Pa. Super. 2019) (citation omitted); ***see also Interest of M.E.***, 283 A.3d 820, 830 (Pa. Super. 2022).

The trial court terminated Mother's parental rights under section 2511(a)(1), (2), (5), (8),[5] and (b). As we may affirm under any ground under section 2511(a), we review the court's decision as to section 2511(a)(2), which provides:

> **(a) General rule**.--The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> * * * * *
>
> **(b) Other considerations**.--The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

---

[5] It is uncontested that Mother has never had custody of Child; thus, subsections (5) and (8) are inapplicable as a matter of law because the plain language of the subsections requires custody. Therefore, we are limited to the trial court's assessment based on section 2511(a)(1) and (2), the only applicable subsections. **See C.S.**, 761 A.2d at 1200-01 (holding parental rights cannot be terminated pursuant to subsections (5) and (8) when the subject child had never been in the custody of the parent in question and thus could not have been removed from the parent's care); **see also In re Adoption of M.B.**, 335 A.3d 327 (Pa. Super. Feb. 12, 2025) (unpublished memorandum, at *6) (same).

23 Pa.C.S.A. § 2511(a)(2), (b).

To establish grounds for termination pursuant to section 2511(a)(2) the following three elements must be met:

(1) repeated and continued incapacity, abuse, neglect or refusal;

(2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; *and*

(3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

*In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa. Super. 2003) (citation omitted) (emphasis added). "The grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct. To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties." *In re A.L.D.*, 797 A.2d 326, 337 (Pa. Super. 2002) (citations omitted).

Mother maintains she completed a parenting class, albeit not with the agency ordered by the court, visited regularly, attended drug treatment, and submitted to random drug screenings for over two years. *See id*. at 34-35. Mother argues that her expert witness, Dr. Terplan, testified that positive drug screens or returning to drug use did not "mean anything for someone's long-term substance use prognosis." *Id*. at 35. Mother notes Dr. Terplan further opined that a positive drug test "isn't categorically a parenting test, it's not a recovery test" *Id*. (record citation omitted).

The trial court stated:

it is clear that DHS met its burden of demonstrating that termination of Mother's parental rights and changing the Child's permanency goal to adoption was proper. The Child has been in DHS care consistently since March 2022. Since then, the record reflects that Mother has not remedied her parental incapacity, which was primarily based on her substance use that led to the Child's placement shortly after birth. While Mother engaged in drug and alcohol treatment at NARP, the record reflects that she did not successfully complete the program. Similarly, while she was attending NARP in 2022 and 2023, she continued to test positive for the same illicit substances that she and the Child tested positive for at birth and which necessitated placement. She also tested positive for cocaine and/or fentanyl on numerous occasions at the CEU.

While Mother began submitting negative drug screens in early 2024, she stopped attending random screens in June 2024. The record is also unclear regarding why Mother stopped attending treatment at NARP. At the time of the [termination ("TPR")] hearing, no evidence was presented regarding Mother's current engagement in drug and alcohol treatment or her progress toward achieving recovery. Th[e trial c]ourt was unable to determine Mother's present progress toward achieving and maintaining sobriety.

Mother also failed to comply with ARC services to improve her parenting skills and address the issues which necessitated placement. Additionally, while Mother used to visit the Child consistently, she stopped visiting in March 2025 and the Child has not seen Mother since then. Her visits also remained supervised throughout the case due to Mother's failure to comply with random drug screens at the CEU since at least October 2024. Th[e trial c]ourt continues to have concerns about Mother's substance use and parental capacity. No documentation has been presented to th[e trial c]ourt to demonstrate that Mother has achieved and maintained sobriety. Such documentation would be necessary to ensure that the Child could be safely reunified with Mother. In failing to address her substance use, parenting concerns, or make an active effort to alleviate the circumstances which brought the Child into care, it is apparent to th[e trial c]ourt that Mother lacks a concrete desire or ability to remedy the conditions that led to the Child's

placement. Her lack of desire to be reunified with the Child is also demonstrated in her failure to consistently visit with the Child since September 2024, and her failure to visit the Child at all since March 2025. Mother did not attend the July 17, 2025, or the September 22, 2025, TPR hearings. Despite substance use treatment and parenting services being available to Mother, she either failed to engage or failed to successfully complete such services, thus demonstrating her continued incapacity and inability to safely care for the Child.

By failing to fully comply with her SCP objectives throughout the case, Mother's actions have left the Child without the essential parental care, control, and subsistence necessary for her physical or mental well-being. The Child has been in DHS care continually for over three years. She has spent her entire life outside of the care and control of Mother and has not seen her in over six months. Since the Child entered DHS care in March 2022, the record reflects that Mother has made minimal progress toward achieving reunification with the Child. For these reasons, the Court found that clear and convincing evidence was presented to involuntarily terminate Mother's parental rights pursuant to § 2511(a)(2).

Trial Court Opinion, 11/18/25, at 18-20.

Our review reveals no error of law or abuse of discretion by the trial court in concluding grounds existed to involuntarily terminate Mother's parental rights pursuant to section 2511(a)(2). As discussed above, Child was placed in the custody of DHS soon after her birth in February 2022, because both Mother and Child tested positive for cocaine and fentanyl and Child was going through withdrawal. *See* N.T., 7/17/25, at 12-13; *see also* Trial Court Opinion, 11/18/25, at 2. While Mother was initially somewhat compliant with her plan objectives regarding drug treatment and visitation, she was unable to remain drug-free, stopped visiting Child, stopped attending random drug screening, and has never progressed beyond supervised visits. *See* N.T.,

7/17/25, at 99-100, 129-30, 132-33, Trial Court Opinion, 11/18/25, at 6-7. The record confirms that Mother regressed during the case and by the time of the TPR hearings, at which she did not appear, had only minimal contact at best with Child and was no closer to achieving reunification than she had been over three years earlier.

Accordingly, we conclude that the evidence supports the trial court's finding of grounds for termination of Mother's parental rights pursuant to section 2511(a)(2). Mother's repeated and continued incapacity due to her drug addiction, which resulted in her never progressing beyond supervised visits over the course of three years, caused Child to be without essential parental care, control, or subsistence necessary for her physical and mental well-being. Mother was given ample time to comply with her objectives and to move beyond supervised visitation but was unable to do so. Thus, the record also supports termination under the final element of section 2511(a)(2), that the causes of Mother's incapacity cannot or will not be remedied. *See In re Adoption of A.H.*, 247 A.3d 439, 443 (Pa. Super. 2021) ("Parents are required to make diligent efforts toward the reasonably prompt assumption of full parental duties."); *See also In re Z.P.*, 994 A.2d 1108, 1118 (Pa. Super. 2010) ("when a parent has demonstrated a continued inability to conduct [her] . . . life in a fashion that would provide a safe environment for a child, whether that child is living with the parent or not, and the behavior of the parent is irremediable as supported by clear and

competent evidence, the termination of the parental rights is justified"). We therefore conclude that Mother's arguments concerning section 2511(a)(2) merit no relief.

In her third issue, Mother claims the evidence was insufficient to terminate her parental rights pursuant to section 2511(b). *See* Mother's Brief at 38-41.

Section 2511(b) affords primary consideration to the developmental, physical, and emotional needs and welfare of the child. *See T.S.M.*, 71 A.3d at 267. Regarding the section 2511(b) best interest analysis, this Court has explained:

> While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child. The mere existence of an emotional bond does not preclude the termination of parental rights. Rather, the [Orphans'] court must examine the status of the bond to determine whether its termination would destroy an existing, necessary and beneficial relationship . . . .
>
> In addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, . . . the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

*In re N.A.M.*, 33 A.3d 95, 103 (Pa. Super. 2011) (internal citations, quotation marks, brackets, and indentation omitted).

The evaluation of a child's respective bonds is not always an easy task. "In cases where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists. The extent of any bond analysis, therefore, necessarily depends on the circumstances of the particular case." *In re K.Z.S.*, 946 A.2d 753, 762-63 (Pa. Super. 2008) (citation omitted). When evaluating a parental bond, "the court is ***not required to use expert testimony. Social workers and caseworkers can offer evaluations as well. Additionally, section 2511(b) does not require a formal bonding evaluation***." *Z.P.*, 994 A.2d at 1121 (internal citations omitted, emphasis added).

Furthermore, "[c]ommon sense dictates that courts considering termination must also consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents." *T.S.M.*, 71 A.3d at 268. In weighing the bond considerations pursuant to section 2511(b), "courts must keep the ticking clock of childhood ever in mind." *Id*. at 269. Children "are young for a scant number of years, and we have an obligation to see to their healthy development quickly. When courts fail . . . the result, all too often, is catastrophically maladjusted children." *Id*.

As our Supreme Court recently explained in *Interest of K.T.*, 296 A.3d 1085, 1113 (Pa. 2023),

> a court conducting the [s]ection 2511(b) needs and welfare analysis must consider more than proof of an adverse or detrimental impact from severance of the parental bond. We emphasize analysis of the parental bond is but one part of the

overall subsection (b) analysis, which includes a determination of whether the bond is necessary and beneficial to the child, *i.e.*, whether maintaining the bond serves the child's developmental, physical, and emotional needs and welfare.

The **K.T.** Court explained that the inquiry must consider and weigh evidence including, but not limited to, the child's need for permanency and length of time in foster care, whether the child is in a pre-adoptive home and bonded with foster parents, and whether the foster home meets all the child's needs "including intangible needs of love, comfort, security, safety, and stability." **Id**. (footnote omitted).

Mother argues there is "ample" evidence of a bond between her and Child. Mother's Brief at 39; **see also id**. at 39-40. Mother also complains the trial court erred in crediting the testimony of a lay case manager, rather than ordering a formal bond analysis.[6] **See id**. at 40.

The trial court explained its reasoning as follows:

The Child has been in DHS care consistently since March 2022 when she was placed with her maternal uncle alter being discharged from the hospital after birth. She is now three years old and has spent her entire life outside of the care and control of Mother. While Ms. Cole testified that she did observe a bond between the Child and Mother, the Child does not ask about Mother nor express a desire to see her. The record reflects that. Mother has not visited the Child in over six months. The Child's behavior[] did not change, and she appeared to be unaffected when Mother stopped visiting in March 2025. While the testimony reflected that the Child enjoyed visiting with Mother, she is an inconsistent visitation resource rather than a parental figure. Conversely, the testimony reflects that the Child has a positive,

_____

[6] Because this claim overlaps with Mother's fourth issue, we analyze it in that section of the memorandum.

- 24 -

beneficial parental bond with her maternal aunt and uncle with whom she has resided for her entire life. She looks to maternal aunt and uncle for love and affection. Based on Mother's inconsistency with visitation since September 2024, and her total lack of visitation since March 2025, th[e trial c]ourt properly found that termination of Mother's parental rights would not destroy an existing, necessary, or beneficial relationship between the Child and Mother.

In determining the best interest of the child, th[e trial c]ourt must consider both the needs and welfare of the child such as love, support, care, and comfort. The Child does not look to Mother to meet these needs. Instead, the Child looks to her maternal aunt and uncle to meet her basic needs as well as for safety and stability. She looks to them for love, support, care, and comfort. Maternal uncle, not Mother, attends the Child's medical appointments and ensures that she is up to date on routine medical care. The Child has resided in her current[] placement since she was discharged from the hospital in March 2022, one month after she was born.

Trial Court Opinion, 11/18/25, at 24.

Following our review, we conclude that the trial court did not err in finding that termination of Mother's parental rights was in Child's best interests, given that there is no evidence of record that a ***parental*** bond exists between the Child and Mother. ***See In re Adoption of A.L.S.***, 313 A.3d 166 (Pa. Super. 2024) (unpublished memorandum at *9) (adopting trial court's conclusion that where children had never lived with mother, mother never progressed beyond supervised visits, and mother ceased visiting regularly, there was no parental bond between mother and children). While there was testimony that Mother did well during her supervised visits with Child, that testimony was qualified by each of the witnesses who noted these were two-hour visits in a highly controlled setting, when both Mother and Child were

healthy. ***See*** N.T., 7/17/25, at 102-03, 126, 166-68, 170-72, 176-77, 188-91, 197-98. Moreover, all the detailed testimony regarding Mother's positive parenting skills demonstrated at visitations concerned visits which occurred prior to March 2024, beginning during Child's infancy and ending when she was a little over two years old. ***See id***. There was little testimony regarding her interactions with the now older Child because Mother stopped visiting. There is no evidence of record that, after over three years, Mother has any ability to parent Child without supervision, care for a sick child, care for Child if Mother is unwell, or do more than have fun visits with a mostly happy child. Child has been in placement for over three years. ***See Z.P.***, 994 A.2d at 1125 (a child's life "simply cannot be put on hold [any longer] in the hope that [Mother] will summon the ability to handle the responsibilities of parenting."). Furthermore, maternal aunt and uncle have provided a safe environment for Child and address her physical, emotional, and developmental needs, and Child has bonded with them. ***See In re D.C.D.***, 105 A.3d 662, 677 (Pa. 2014) (trial court properly considered child's "strong bond with [ ] foster family with whom [child] has lived nearly all her life and who has indicated a desire to adopt her").

There is simply no factual dispute that Mother has been unable to fulfill her parental duties to Child. As this Court acknowledged in ***In re B., N.M.***, 856 A.2d 847, 856 (Pa. Super. 2004), "a parent's basic constitutional right to the custody and rearing of [her] child is converted, upon the failure to fulfill

. . . her parental duties, to the child's right to have proper parenting and fulfillment of his or her potential in a permanent, healthy, safe environment." *Id*. at 865. Consequently, the trial court did not err or abuse its discretion in terminating her parental rights. Mother's third issue does not merit relief.

In her fourth issue, Mother contends the trial court erred in admitting lay opinion testimony in violation of Pa.R.E. 701 with respect to the section (b) analysis. *See* Mother's Brief at 41-44.

Pa.R.E. 701 provides:

If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is:

(a) rationally based on the witness's perception;

(b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and

(c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

Mother argues that case managers who are not qualified experts should not be allowed to testify or give "predicative opinions" about the effects of severing a bond. *See* Mother's Brief at 42. Mother distinguishes our decision in *Z.P.*, 994 A.2d at 1121, which specifically allows such testimony, alleging *Z.P.* is a case where there was no bond, while in the instant matter there is some bond.[7] *See id*. Mother cites our earlier decision in *In re K.Z.*, 946 A.2d

_____

[7] The testimony regarding the bond looked back to the period when Mother was visiting consistently. Given the age of Child and the lack of consistent
*(Footnote Continued Next Page)*

753, 762 (Pa. Super. 2008) where we stated if there was any evidence of a bond "the wisest approach" is to have a formal bond analysis.[8] ***See id***.

We do not find Mother's argument persuasive. While Mother is correct in stating that ***Z.P.***, was a case in which there was no bond between the parent and child, Mother does not point to, and we have not discovered any case where we have limited its holding regarding lay opinion testimony of social workers or case managers to cases in which there was no bond between the parent and child. ***See Z.P.***, ***supra***; Mother's Brief at 43-45. To the contrary, we have applied ***Z.P.*** to cases where there was a bond between parent and child but not a parental bond. ***See***, ***e***.***g***., ***K.A.R.Z.***, 346 A.3d 342 (Pa. Super. 2025) (unpublished memorandum at *9) (applying ***Z.P.*** in case where there was a bond between father and child, child called parent "Dad" was always happy to see him but crediting testimony of the caseworker that child's primary bond was with his foster family). Moreover, our statement in ***K.Z.***, ***supra***, was *dicta*, not a mandate which requires a bond analysis in every case. Given the facts in this case as outlined above, we find no error in the trial court's failure to order a bond analysis and relying on the lay opinion testimony of Ms. Cole. ***See Z.P.***, ***supra***. Mother's fourth issue does not merit relief.

_____

visitation for close to ten months prior to the TPR hearing, it is not evident how much of a bond remains.

[8] Mother does not claim that she ever requested a formal bond analysis or that such request was denied.

In her fifth and final issue, Mother argues the proceeding violated her procedural due process rights. *See* Mother's Brief at 48-59.

Our standard of review is settled.

> In determining whether procedural due process violations have occurred, our standard of review is *de novo* and our scope of review is plenary. Due process of law is guaranteed by Article I, §[§ 1 and 11] of the Pennsylvania Constitution and the Fourteenth Amendment of the United States Constitution and it protects life, liberty, and property. In assessing whether one has been unlawfully deprived of a protected right, a two-part inquiry must be undertaken. The threshold inquiry in any due process analysis is whether there exists any identifiable property or liberty interest at issue. Once this has been established, a determination must be made regarding the adequacy of the procedures employed by the state to deprive a person of that right.

*In re K.L.*, 286 A.3d 1267, 1271 (Pa. Super. 2022) (citations and footnote omitted and formatting altered).

Mother claims the termination of her parental rights violated her due process rights under both the Fourteenth Amendment to the United States Constitution and Article I, Sections 1 and 11 of the Pennsylvania Constitution. *See* Mother's Brief at 48-59. Mother avers as a parent, she has a fundamental right to direct the care, custody and control of her children. *See id*. at 48. She contends any state action to terminate that fundamental right is subject to strict scrutiny review, *i.e.*, "the state must demonstrate a compelling interest and show that its actions are narrowly tailored to achieve that interest. . . . To survive strict scrutiny, a law must further the state's compelling interest by the least restrictive means practically available." *Id*. at 52 (citations omitted); *see also id*. at 50-52. Mother concedes protecting

children from harm and promoting their welfare "are state interest of utmost importance." *Id*. at 52. However, she believes that the state must do everything possible in all situations to preserve the parental bond. *See id*. Mother claims the termination of her parental rights was not the least restrictive means available to achieve that interest because DHS could have requested that the trial court grant the kinship care provider permanent legal custody ("PLC"). *See id*. at 56-58.

The trial court cogently explained:

It is well-settled that any individual whose parental rights are to be terminated must be afforded due process. *See In re Adoption of K.M.D.*, 261 A.3d 1055, 1059 (Pa. Super. 2021). The Supreme Court has held that the right to make decisions concerning the care, custody, and control of one's children is one of the oldest fundamental rights protected by the Due Process Clause. As such, any infringement of that right is subject to strict scrutiny requiring that the infringement be narrowly tailored to support a compelling state interest. *See Hiller v. Fausey*, 904 A.2d 875, 885 (2006). In *In the Interest of D.C.D.*, the Pennsylvania Supreme Court found that there is a compelling state interest in protecting the welfare of children and providing permanency for dependent children. The Court must then balance that compelling state interest with a parent's fundamental right to raise their child. *See In the Interest of D.C.D.*, 105 A.3d [662, 676-77].

The Pennsylvania Supreme Court explained that, in balancing these interests, the General Assembly created a detailed system setting forth the limited situations that would result in removal of children from their parents and termination of parental rights. *See* [] *D.C.D.*, 105 A.3d at 676-77. The Juvenile Act established a hierarchy of permanency goals for children in the child welfare system, giving the highest preference to reunification. The Juvenile Act also requires specific determinations to be made by the trial court regarding the Child's proper placement and permanency goals at each step of the dependency process. One important determination is whether reasonable efforts have been

made to facilitate the goal of reunification. *See* 42 Pa.C.S.A. §6351. Additionally, due process requires that the grounds for termination of parental rights be demonstrated by the state by clear and convincing evidence. *See* 23 Pa.C.S.A. §2511. Case law has previously held that this statutory system is sufficiently narrowly tailored to protect a parent's fundamental right to parent their child while also ensuring the safety and permanency needs of dependent children. . . .

When the Child was adjudicated dependent, [SCP] objectives were developed to assist Mother in achieving the preferred permanency goal of reunification. Since [Child's] adjudication, permanency review hearings were conducted on a regular basis to facilitate reunification. CUA held SCP meetings throughout the case to discuss the objectives that Mother needed to complete to reunify with the Child. Mother's SCP objectives remained the same throughout the case. At each permanency review hearing, [the trial c]ourt heard testimony regarding Mother's compliance with her SCP objectives and her progress to alleviate the reasons that brought the Child into care. At each hearing, the Court found that reasonable efforts were made to facilitate reunification with Mother. Throughout the case, Mother was minimally compliant with her SCP objectives and made minimal progress toward alleviating the circumstances which brought the Child into care. On April 30, 2024, after the Child had been in placement for over two years and because Mother had not fully complied with her SCP objectives, DHS filed petitions to change the Child's permanency goal from reunification to adoption and to involuntarily terminate Mother's parental rights.

On July 17, 2025, and September 22, 2025, [the trial c]ourt heard testimony regarding whether to grant DHS's petition to terminat[e] Mother's parental rights or whether PLC was a more appropriate permanency goal for the Child. Mother's counsel argues that adoption was not an appropriate goal and that PLC was the most appropriate goal in this case. Reunification is the preferred permanency goal for dependent children under the Juvenile Act. When reunification is no longer the permanency goal best suited to the Child's safety and welfare, adoption is the preferred legal permanency goal. *See* 42 Pa. C.S.A. §6351(f. 1). The testimony reflected that reunification with Mother was no longer viable after the Child spent over three years in placement and Mother demonstrated that she would not alleviate the

- 31 -

circumstances which necessitated placement within a reasonable amount of time.

In termination proceedings, the best interest of the children is paramount. *See* [*K.T.*, 296 A.3d at 1105]. [The trial c]ourt recognizes that termination of parental rights and adoption is the most permanent permanency option for dependent children and involves the greatest infringement on parental rights. However, reunification has been ruled out in this case. Adoption is also the permanency goal which provides the most stability for children involved in the child welfare system. While Mother's counsel argued that PLC was the most appropriate permanency goal, PLC should only be considered if adoption has been ruled out as a viable permanency option. The testimony reflects that there was no reason for adoption to be ruled out here. The Child is three years old. She has resided with maternal uncle since March 2022 when she was discharged from the hospital shortly after birth. Maternal uncle has been the Child's primary caregiver for her entire life, and his home is the only home the Child has ever known. The record reflects neither Mother nor Father have visited the Child since March 2025 and to remove the Child from the only home she has ever known would cause her irreparable harm.

Despite reasonable efforts to facilitate reunification between the Child and Mother, Mother has failed to fully alleviate the circumstances which necessitated placement. If reunification is no longer viable, adoption is preferred permanency outcome under the Juvenile Act. [The trial c]ourt found that clear and convincing evidence was presented to involuntary[il]y terminate Mother's parental rights pursuant to the Adoption Act[.] Adoption is the permanency goal best suited to the needs and welfare of the Child. This Child deserves permanency and should not wait indefinitely.

Trial Court Opinion, 11/18/25, at 29-31 (citation format regularized).

We find the trial court's analysis both an accurate statement of the law and persuasive in its reasoning. We therefore adopt it. Moreover, in a recent memorandum, this Court rejected this identical claim, stating,

[w]e disagree with Mother's argument that PLC was a less restrictive means to ensure that the Children had a safe and

permanent home. Under the Juvenile Act, a trial court may only award PLC to the custodian of a child where **neither reunification nor adoption** is best suited to the child's safety, protection and physical, mental and moral welfare.

*Interest of B.E.C.*, 313 A.3d 167 (Pa. Super. 2024) (unpublished memorandum at *9) (emphasis in original, internal quotation marks and citations omitted). Here, Mother was afforded all due process which the Constitution requires, her fifth issue does not merit relief.

Accordingly, for the reasons discussed above, we affirm the involuntary termination decree and dismiss the appeal from the goal change order as moot.

Decree affirmed. Appeal from goal change order dismissed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 7/22/2026